**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

DIAMOND CARE VIDA ENCANTADA,
LLC, a New Mexico limited liability company;
MATTHEW K. MEYER; JOSEPH A.
MARTIN; MARY E. MARTIN;
HEALTHCARE MANAGEMENT SERVICES,
LLC, an Arizona limited liability company;
MIKA HEALTHCARE SERVICES, LLC, an
Arizona limited liability company, and
DIAMOND HEALTH CARE NETWORK,
LLC, an Arizona limited liability company,

        Plaintiffs,

vs.                                                                    No. CIV 23-0054 JB/GBW

2301 COLLINS DRIVE NM, LLC,
a Delaware limited liability company,

        Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on (i) the Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction, filed in State Court on December 22, 2022, filed in Federal Court on January 20, 2023 (Doc. 6)("Plaintiffs' TRO"); and (ii) the Defendant's Application for Temporary Restraining Order, filed January 22, 2023 (Doc. 14)("2301's TRO"). The Court held a hearing on January 23, 2023. The primary issue is whether, pursuant to rule 65 of the Federal Rules of Civil Procedure, the Court should (i) grant the Plaintiffs' request for a temporary restraining order ("TRO") enjoining Defendant 2301 Collins Drive NM, LLC ("2301 Collins") from taking control of the Vida Encantada nursing home and related entities; or (ii) grant 2301's TRO and order the Plaintiffs to cooperate in handing over the nursing home to 2301 Collins. Because (i) the Plaintiffs show that (a) they have a substantial likelihood of succeeding on the merits in defending the Defendants' breach-of-contract claim under Maryland law; (b) damages

would be an inadequate remedy; and (c) that they would suffer irreparable harm if the Court does not issue a TRO; and (ii)  2301 Collins does not show that (a)  it has a substantial likelihood of succeeding on the merits of its breach-of-contract claim under Maryland law; (b)  damages would be an inadequate remedy; or (c) it will suffer irreparable harm if the Court does not issue a TRO; the Court will grant the Plaintiffs' request for a TRO and deny 2301 Collins' request for a TRO.

## FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiffs operate a Las Vegas, New Mexico nursing home, Vida Encantada, on premises they lease from Defendant 2301 Collins Drive NM, LLC ("2301 Collins"). [1]  The crux of the dispute is a breach of contract claim, namely, whether the Plaintiffs have defaulted on the lease and related agreements (the "Transaction Documents"), and whether those defaults give 2301 Collins the legal right to terminate the lease and take over Vida Encantada and related business entities.  The Plaintiffs' TRO seeks the Court to enjoin 2301 Collins from evicting, foreclosing, or otherwise interfering with their interests in and operation of the nursing home.  See Plaintiffs' TRO at 10.  2301's TRO asks the Court to affirm their rights under the Transaction Documents to take control of the nursing home and order the Plaintiffs to cooperate and "affect the transition" of the nursing home to 2301 Collins' control and ownership.  Defendant's Answer to Plaintiffs' First Amended Complaint and Counterclaim ¶ 51, at 20, filed January 20, 2023 (Doc. 13)("Answer and Counterclaim").  See 2301's TRO at 1-2.

---

[1]Vida Encantada Nursing & Rehab is a nursing home located at 2301 Collins Drive, Law Vegas, New Mexico.  Several of the Plaintiff entities have similar names to this facility and the Defendant shares a name with the street address.  The Court uses "Vida Encantada" to refer to the nursing home that is the res of this dispute -- i.e. the physical facility, attendant fixtures, and its on-the-ground operations providing care to patients.  The Court refers to the Defendant who owns the premises -- 2301 Collins Drive NM, LLC -- as "2301 Collins."  The Court refers to the Plaintiff entity that owns and operates Vida Encantada -- Diamond Care Vida Encantada, LLC -- as "Diamond Care."

Because neither party has attached affidavits to their pleadings or motions, the Court must rely on the parties' representations.  Accordingly, the Court takes its facts from: (i) the Plaintiffs' First Amended Verified Complaint for Declaratory Judgment, Reformation, Preliminary and Permanent Injunction, Temporary Restraining Order, Breach of Contract and Equitable Relief From Forfeiture, filed in State Court on December 22, 2022, filed in Federal Court on January 19, 2023 (Doc. 1-1 at 1)("Amended Complaint"); (ii) the Plaintiffs' TRO; (iii) the Defendant's Answer and Counterclaim; (iv) the Defendant's TRO; (v) the Plaintiffs' Response to Defendant's Application for Temporary Restring Order (Docket No. 14), filed January 27, 2023 (Doc. 20)(Plaintiffs' Response); and (vi) the factual representations that the parties made at the January 23, 2023 hearing.  "A temporary restraining order requires the Court to make predictions about the plaintiff's likelihood of success."  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.).  Rule 52 of the Federal Rules of Civil Procedure states: "In granting or refusing an interlocutory injunction, the court must . . . state the findings and conclusions that support its action."  Fed. R. Civ. P. 52(a)(2).  "'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'"  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1179 (quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools only).  See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.");  Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union  No. 1505, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.).

The United States Court of Appeals for the Tenth Circuit notes "that when a district court

holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits." Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003). Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." Heideman v. S. Salt Lake City, 348 F.3d at 1188. Thus, while the Court does the best it can to make accurate findings from the record that it has, and in the short time that it has to make findings, these findings of fact are relevant only for the purpose of determining whether to issue a TRO and do not bind the Court or the parties at trial. Accordingly, the Court finds as follows:

      **1.**      **The Parties.**

      1.      This dispute centers on a nursing home located at 2301 Collins Drive, Las Vegas, New Mexico, doing business as Vida Encantada Nursing & Rehab ("Vida Encantada"). See Amended Complaint ¶ 28, at 5; Answer and Counterclaim ¶ 28, at 3-4.

      2.      Vida Encantada houses and treats around seventy patients. See Amended Complaint ¶ 28, at 5; Answer and Counterclaim ¶ 28, at 3-4.

      3.      The Plaintiffs have owned and operated Vida Encantada since 2010, when they entered into a lease and related Transaction Documents with CSE Las Vegas LLC, Inc. ("CSE Las Vegas"), a Delaware limited liability company based in Maryland. See Amended Complaint ¶ 28, at 5; Answer and Counterclaim ¶ 28, at 3-4.

      4.      Plaintiff Diamond Care Vida Encantada, LLC ("Diamond Care") is a New Mexico limited liability company. See Amended Complaint ¶ 1, at 2.

      5.      Diamond Care is the business entity that operates the Vita Encantada Nursing & Rehab nursing home. See Amended Complaint ¶ 28, at 5; Answer and Counterclaim ¶ 28, at 3-4.

      6.      Diamond Care's members are M. Meyer, J. Martin, E. Martin, Health Care

Management Services, LLC, and MIKA Healthcare Services: LLC,. <u>See</u> Amended Complaint ¶ 7, at 2.

7. Health Care Management Services, LLC is an Arizona limited liability company. <u>See</u> Amended Complaint ¶ 5, at 2.

8. MIKA Healthcare Services: LLC, is an Arizona limited liability company. <u>See</u> Amended Complaint ¶ 6, at 2.

9. Diamond Health Care Network, LLC is "an Arizona limited liability company and an affiliate of" Diamond Care. Amended Complaint ¶ 8, at 2.

10. Plaintiff Matthew K. Meyer is a citizen of Maricopa County, Arizona. <u>See</u> Amended Complaint ¶ 2, at 2.

11. Meyer is Diamond Care's Chief Executive Officer. <u>See</u> Amended Complaint ¶ 31, at 5.

12. Plaintiff Joseph A. Martin is a citizen of Maricopa County, Arizona. <u>See</u> Amended Complaint ¶ 3, at 2.

13. Plaintiff Mary E. Martin is a citizen of Maricopa County, Arizona. <u>See</u> Amended Complaint ¶ 4, at 2.

14. Plaintiffs Meyer, J. Martin, and M. Martin are the equity holders in Diamond Care. <u>See</u> Amended Complaint ¶ 20, at 4.

15. The members and ultimate beneficiaries of all the Plaintiff LLCs are citizens of Arizona or New Mexico. <u>See</u> Plaintiffs' Statement of Citizenship at 1-2, filed January 26, 2023 (Doc. 19).

16. In December, 2017, CSE Las Vegas sold its interests in Vida Encantada and assigned its lease to 2301 Collins, effective January 1, 2018. <u>See</u> Assignment and Assumption of

Lease at 1 (dated December 29, 2017), filed January 23, 2023 (Doc. 18-1)("Lease Assignment");
Answer and Counterclaim ¶ 1, at 10.

17.     As part of this transaction, CSE Las Vegas "transferred to Defendant [2301 Collins]
its rights and obligations under the [Transaction Documents] all four of which are, collectively,
the documents governing the relationship between Plaintiffs and Defendant."   Answer and
Counterclaim ¶ 1, at 10.  See Lease Assignment at 1.

18.     2301 Collins is a Delaware limited liability company.  See Defendant's Statement
of Citizenship at 1-2, filed January 23, 2023 (Doc. 17).

19.      2301 Collins' ultimate owners are trusts based in California and Delaware, and
each and every trustee and beneficiary of these trusts is a California citizen.  See Defendant's
Statement of Citizenship at 1-2

20.     Since January, 2018, 2301 Collins has owned the real property at 2301 Collins
Drive and leased the premises to the Plaintiffs.  See Answer and Counterclaim ¶ 1, at 10.

21.     2301 Collins or its affiliates also own and operate other nursing home facilities,
including some in New Mexico.  See Amended Complaint ¶ 10, at 2; Answer and Counterclaim
¶ 10, at 2.

**2.     The Transaction Documents.**

22.     In September, 2010, the Plaintiffs entered into four interrelated agreements with
CSE Las Vegas: (i) the Single Facility Lease (dated September 30, 2010), filed January 19, 2023
(Doc. 1-1 at 24)("Lease"); (ii) the Security Agreement (dated September 30, 2010), filed January
19, 2023 (Doc. 1-1 at 106)("Security Agreement"); (iii) the Guaranty (dated September 30, 2010),
filed January 19, 2023 (Doc. 1-1 at 119)("Guaranty"); and (iv) the Pledge Agreement (dated
September 30, 2020), filed January 19, 2023 (Doc. 1-1 at 128)("Pledge Agreement").  See

Amended Complaint ¶ 13, at 3; Answer and Counterclaim ¶ 13, at 2.

23.     The Lease refers to these four documents as the "Transaction Documents."  Lease §2.1, at 19.

24.     The Lease governs the duties and obligations of Diamond Care and its landlord -- originally CSE Las Vegas and now 2301 Collins.  See 2301's TRO at 2; Lease §1.1, at 1.

25.     The Security Agreement grants "a lien on Plaintiff Diamond Care's assets, including personal property and fixtures to the facility." 2301's TRO at 2. See Security Agreement at 1-2.

26.     In the Pledge Agreement, "the equity owners of Plaintiff Diamond care -- Plaintiffs Matthew Meyer, Joesph Martin, and Mary Martin" -- pledge their shares in Diamond Care as collateral "to secure Plaintiff Diamond Care's obligations under the Lease Agreement."  2301's TRO at 2. See Pledge Agreement at 1-2.

27.     The Guaranty "obligates Plaintiff Diamond Health Care Network, LLC to guarantee Plaintiff Diamond Care's performance under the Lease Agreement."  2301's TRO at 2. See Guaranty at 1-2.

28.     All four of the Transaction Documents specify that Maryland law governs; CSE Las Vegas is based in Maryland.  See Plaintiffs' TRO at 2; Lease §32.1, at 60; Guaranty §15(c), at 7.

**3.      Relevant Portions of the Transaction Documents.**

29.     Lease §1.2 establishes an initial lease term of twelve years -- from October 2010 through October 2012.  See Lease §1.2, at 1.

30.     Lease §1.3, entitled "Option to Renew," grants the Plaintiffs an option to renew the lease for two additional ten-year periods.  See Lease §1.3, at 1-2.

31.     The Plaintiffs properly exercised their first option to renew, with the first ten-year renewal term beginning on October 1, 2022.  <u>See</u> Amended Complaint ¶ 30, at 5.

32.     Lease §2.1 lists and defines the terms that the Lease uses.  <u>See</u> Lease §2.1, at 2-19.

33.     The portion of Lease §2.1 that defines the term "<u>Event of Default</u>" is at the heart of the parties' dispute.  Answer and Counterclaim ¶ 2 at 10 (citing to Lease §2.1, at 6-9).

34.     The Event of Default section defines that term as "the occurrence of any of the following:" then recites a list lettered (a) through (p). Lease §2.1, at 6-9.

35.     The first item in the Event of Default list, lettered (a) reads: "Lessee fails to pay or cause to be paid the Rent when due and payable."  Lease §2.1, at 6 ("Event of Default (a)").

36.     The penultimate item in the Event of Default list, lettered (o) reads:

> Lessee, Guarantor or their Affiliates fail to observe or perform any other term, covenant or condition of this Lease or any other Transaction Document and the failure is not cured by Lessee within a period of thirty (30) days after Notice thereof from Lessor, unless the failure cannot with due diligence be cured within a period of thirty (30) days, in which case such failure shall not be deemed an Event of Default if and for so long as Lessee proceeds promptly and with due diligence to cure the failure and completes the cure prior to the time that the same causes a Material Adverse Effect, a default in any Facility Mortgage or any other lease to which Lessee is subject and prior to the time that the same results in civil or criminal penalties to Lessor, Lessee, any Affiliates of either or to the Leased Properties;

Lease §2.1, at 6 ("Event of Default (o)").

37.     Lease §3.1 of the Lease provides that rent is due and payable on the first of the month via wire transfer. <u>See</u> Lease §3.1, at 2; Amended Complaint ¶ 31, at 5; Answer and Counterclaim ¶ 31, at 4.

38.     Lease §3.3, entitled "<u>Late Charge; Interest</u>," states:

> If any Rent payable to Lessor is not paid when due, Lessee shall pay Lessor on demand, as an Additional Charge, a late charge equal to the greater of (a) five percent (5%) of the amount not paid when due and (b) any and all charges, expenses, fees or penalties imposed on Lessor by a Facility Mortgagee for late

payment, and, in addition, if such Rent (including the late charge) is not paid within thirty (30) days of the date on which such Rent was due, interest thereon at the Overdue Rate from the date when due until such Rent (including the late charge and interest) is paid in full.

Lease §3.3, at 20-21.

39.     Lease §16.1, entitled "<u>Lessor's Rights Upon an Event of Default</u>," states:

> If an Event of Default occurs, Lessor may terminate this Lease by giving Lessee a Notice of Termination, and in such event the Term shall end and all rights of Lessee under this Lease shall cease on the Termination Date. . . . Lessee. shall, to the extent permitted by law, pay as Additional Charges. all costs and expenses. Incurred by or on behalf of Lessor, including, without limitation, reasonable attorneys' fees and expenses (whether or not litigation is commenced, and if litigation is commenced, including, fees and expenses incurred in appeals and post-judgment proceedings) as a result of any default of Lessee hereunder.

Lease §16.1, at 68-69.

40.     Lease §29.2, entitled "<u>Transfer of Operation Control of the Facility,</u>" provides: "Upon the expiration or earlier termination of the Term, Lessee shall cooperate fully in transferring operation control of the Facility to Lessor . . . .   Upon the request of Lessor, Lessee shall execute and deliver an Operations Transfer Agreement to Lessor . . . ."  Lease §29.2.2, at 58.

41.     Lease §32.33 of the lease makes time of the essence.  <u>See</u> Lease §32.33, at 63.

42.     Lease §32.12 of the Lease states:

> <u>No Waiver</u>. No failure by Lessor to insist upon the strict performance of any term hereof or to exercise any right, power or remedy consequent upon a breach hereof, and no acceptance of full or partial payment of Rent during the continuance of any such breach, shall constitute a waiver of any such breach or of any such term. No waiver of any breach shall affect or alter this Lease, which shall continue in full force and effect with respect to any other then existing or subsequent breach.

Lease §32.12, at 62.

### 4.     <u>The Breakdown in Relations Between the Plaintiffs and 2301 Collins</u>.

43.     "As required by the Lease Agreement, Plaintiff Diamond Care wires its rent

payments into an account designated by" 2301 Collins.  2301's TRO at 3.  See Lease §3.1.1.

44.    2301 Collins uses this account to pay the mortgage on the nursing home, with the "mortgage payment automatically swept from the account each month."  2301's TRO at 3.  See Answer and Counterclaim ¶ 17, at 14-15.

45.    "From January 2018 to October 2022, Plaintiff Diamond Care was anywhere from one to four days late paying rent on 13 occasions," (i.e. nearly one out of every four months). 2301's TRO at 3.

46.    Meyer, Diamond Care's CEO, is responsible for making Diamond Care's rent payments.  See Amended Complaint ¶ 31, at 5.

47.    On November 14, 2022, 2301 Collins received notice that its monthly mortgage payment for November had not been paid.  See Answer and Counterclaim ¶ 20, at 15.

48.    2301 Collins had to use other funds to pay the mortgage payment.  See Answer and Counterclaim ¶ 21, at 15.

49.    On November 14, 2022, a representative from 2301 Collins texted Meyer, alerting him that 2301 Collins "had not received the November[,] 2022 rent payment" and "asking for the rent to be paid immediately."  Answer and Counterclaim ¶ 36, at 5.

50.    Meyer sent the November, 2022, rent payment the next day, November 15, 2022. See Amended Complaint ¶ 37, at 6; Answer and Counterclaim ¶ 37, at 5.

51.    The Plaintiffs characterize their nonpayment of the November rent as a "mistake and an accident," explaining that "Meyer simply forgot to make the payment due on November 1 due to the fact that he was distracted while out of state caring for his critically ill father in an Ohio hospital."  Plaintiffs' TRO at 8.

52.    2301 Collins returned the payment the following day, November 16, 2022, and

informed the Plaintiffs that they "intended to terminate the Lease due to the late rent payment and thus force Vida Encantada to vacate the Premises."  Amended Complaint ¶ 38, at 6.  See 2301's TRO at 3-4.

53.     On November 17, 2022, Diamond Care re-wired the November, 2022 rent payment, "plus the five percent late fee as provided in [Lease §]3.3."  Amended Complaint ¶ 39, at 6.

54.     That same day, 2301 Collins again returned Diamond Care's proffered payment. See Amended Complaint ¶ 40, at 6.

55.     On November 23, 2022, Diamond Care filed an action in the Fourth Judicial District Court, County of San Miguel, State of New Mexico, seeking a declaratory judgement and injunctive relief to prevent 2301 Collins from evicting them from Vida Encantada under the Lease, replacing Diamond Care's officers under the Pledge Agreement, and foreclosing on their equity interests under the Guaranty.  See Verified Complaint for Declaratory Judgment, Preliminary and Permanent Injunction and Breach of Contract by Anticipatory Repudiation, filed in State Court on November 23, 2023, filed in Federal Court on January 20, 2023 (Doc. 3)("Original Complaint").

56.     Diamond Care did not serve the Original Complaint on 2301 Collins, and 2301 Collins did not learn at that time that the Plaintiffs are seeking judicial relief.  See 2301's TRO at 4.

57.     The next month, the Plaintiffs promptly tendered their outstanding rent balance and sought to prepay the January, 2023 rent, but 2301 Collins returned these payments.  See Amended Complaint ¶¶ 43-44, at 6; id. ¶¶ 49-50 at 7.

58.     On December 1, 2022, 2301 Collins sent the Plaintiffs a letter "proposing that the parties agree to terminate the Lease effective February 1, 2023."  Amended Complaint ¶ 45, at 7. See Letter from 2301 Collins Drive NM, LLC to Diamond Care Vida Encantada, LLC at 1 (dated

December 1, 2022), filed January 19, 2023 (Doc. 1-1 at 145)("December 1 Letter").

59.     In the December 1 Letter, 2301 Collins proposed that, on the Termination Date, 2301 Collins would pay Diamond Care "the sum of One Million Dollars ($1,000,000)."  December 1 Letter at 1.

60.     Diamond Care rejected 2301 Collins' proposal and did not agree to terminate the Lease.  See Amended Complaint ¶ 46, at 7.

61.     On December 14, 2022, 2301 Collins sent a letter to Diamond Care.  See Letter from Jennifer M. Sternshein to Diamond Care Vida Encantada, LLC at 1-2 (dated December 14, 2022), filed January 22, 2023 (Doc. 14-1)("December 14 Letter").

62.     In the December 14 Letter, 2301 Collins "notified Plaintiff Diamond Care that, in addition to the Event of Default for the failure to timely pay rent, it was in violation of Sections 2.1, 13.3, 23.1(a), 23.1(b), 23.1(c), 23.1(d), 23.1(f), 23.1(h), and 23.1(l) of the Lease Agreement." 2301's TRO at 4.  See December 14 Letter at 1-2.

63.     On December 22, 2022, the Plaintiffs amended their complaint and filed their TRO motion in State Court.  See Plaintiffs' TRO at 1; 2301's TRO at 4.

64.     On January 13, 2023, J. Martin replied to 2301 Collins' December 14 letter via email with the subject line "Re: Vida's Lessee Certificate -- Past Due Financial Statements and Proof of Insurance."  Email from Joe Martin to Liz Hagins at 1 (dated January 13, 2023), filed January 22, 2023 (Doc. 14-2)("January 13 Email").

65.     In the January 13 Email, J. Martin attached some recent financial statements, and some documentation related to insurance coverage.  See Answer and Counterclaim ¶ 6, at 11; January 13 Email at 1.

66.     2301 Collins reviewed these documents and concluded that they did not cure many

of the breaches 2301 Collins had identified in its December 14 Letter.  <u>See</u> Answer and Counterclaim ¶ 7, at 11.

67.     On January 17, 2023, 2301 Collins responded to the Plaintiffs' January 13 Email in a letter.  <u>See</u> Letter from Jennifer M. Sternshein to Diamond Care Vida Encantada, LLP at 1-4 (dated January 17, 2023), filed January 22, 2023 (Doc. 14-3)("January 18 Letter").

68.     In the January 17 Letter, 2301 Collins identifies the defaults that the Plaintiffs have failed to cure in the thirty days since the December 14 Letter, and provides formal notice that 2301 Collins is terminating the Lease.  <u>See</u> Answer and Counterclaim ¶ 10, at 13.

69.     The January 17 Letter also asserts that 2301 Collins is exercising its right under the Pledge Agreement to replace Diamond Care's officers with its own designees, effective January 18, 2023.  <u>See</u> Answer and Counterclaim ¶ 11, at 13-14; January 17 Letter at 3.

70.     2301 Collins also informs the Plaintiffs that it will exercise its rights under the Pledge Agreement to foreclose on the Plaintiffs' equity interests in Diamond Care.  <u>See</u> Answer and Counterclaim ¶ 12, at 14; January 17 Letter at 3-4.

71.     On January 19, 2023, 2301 Collins removed the case to federal court on the basis of diversity jurisdiction.  <u>See</u> Notice of Removal at 1, filed January 19, 2023 (Doc. 1).

72.     On January 20, 2023, 2301 Collins filed its Answer and Counterclaim, alleging that the Plaintiffs had breached the Lease and other Transaction Documents, and seeking both damages and injunctive relief.  <u>See</u> Answer and Counterclaim at 1-21.

73.     On January 22, 2023, 2301 Collins filed 2301's TRO, seeking the Court to compel the Plaintiffs to cooperate in handing over control of Vida Encantada.  <u>See</u> 2301's TRO at 1-14.

74.     On January 23, 2023, the Court held a hearing on the Plaintiffs' TRO and 2301's TRO.

## LAW REGARDING REQUESTS FOR A TRO

The requirements for a TRO issuance are essentially the same as those for a preliminary injunction ("PI") order.  See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004).  The primary differences between a TRO and a PI are that a TRO may issue without notice to the opposing party and that TROs are limited in duration to fourteen days.  See Fed. R. Civ. P. 65(b)(1)-(2).  In both cases, however, injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted. Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)).  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181.  The Supreme Court of the United States of America has explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2003)("'In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.'")(quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986)).

To establish its right to a TRO under rule 65(b), a moving party must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless a court issues the order.  Fed. R. Civ. P. 65(b).  "[I]rreparable injury" is "harm that cannot be undone, such as by an award of compensatory damages or otherwise."  Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d 1081, 1105 (10th Cir. 2003)(citing Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d at 355).  A moving party must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that

the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)("Winter")(citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-12 (1982)).

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. Nken v. Holder, 556 U.S. 418, 434 (2009). It is insufficient, moreover, that a moving party demonstrate that there is only a "possibility" of either success on the merits or irreparable harm. Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276 (10th Cir. 2016)("Diné"). In Diné, the United States Court of Appeals for the Tenth Circuit held that a relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in Winter v. Natural Resources Defense Council," which "overruled the Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm." Diné, 839 F.3d at 1282 (citing Winter, 555 U.S. at 22). The Tenth Circuit concluded that, although the standard that the Supreme Court found wrong in Winter v. Natural Resources Defense Council, Inc. dealt with the irreparable-harm factor, "Winter's rationale seems to apply with equal force" to the likelihood-of-success factor. Diné, 839 F.3d at 1282. Accordingly, the Tenth Circuit held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Diné, 839 F.3d at 1282.

Under rule 65(c), the Court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The United States, and its officers and agencies, are exempt from this requirement. See Fed. R. Civ. P. 65(c). The Court

must consider whether a bond is necessary.  See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable.").  See also Flood v. ClearOne Comm'ns, 618 F.3 1100, 1126 n.4 (10th Cir. 2010).  Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security''' and may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d at 1215 (quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

The Court has written several times on the topic of TROs and PIs.  In O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d 1239 (D.N.M. 2017), the Court issued a PI requiring the United States Citizen and Immigration Services ("USCIS") to reconsider the I-129 nonimmigrant R-1 petition to a religious minister to the O Centro Espirita Beneficiente Uniao Do De Vegetal Christian spiritualist religious organization ("O Centro").  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1269.  The Court issued that relief, in part because it was substantially likely that the USCIS' first denial of the minister's R-1 petition violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA").  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1263-64.  USCIS had denied the petition, because the minister made no money and because the minister was not part of an established missionary program.  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1264.  O Centro theology precluded its ministers from making money, and an established missionary program requires that at least one religious worker, at some point, be compensated.  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1264.  The Court reasoned, accordingly, that DHS had burdened substantially the minister's right to exercise his religion, because, in effect, the R-1 petition review required the minister to make

money to preach his liturgy in the United States, even though his religion forbade him from making money.  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1264. The minister also met a PI's other three prongs, so the Court granted the relief requested.  See 286 F. Supp. 3d at 1265-66.  The Court has also issued a TRO, prohibiting the Santa Fe Public Schools from suspicionless pat-down searches of its students before prom and graduation.  See Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1200.  It concluded that: (i) a violation of the Fourth Amendment of the Constitution of the United States "standing alone" constitutes irreparable injury; (ii) suspicionless pat-down searches involving "touching of students' bodies," including "cupping and shaking girls' breasts," are unreasonably and unconstitutionally intrusive, even if those searches likely are effective in apprehending students with drugs, weapons, alcohol, or "distracting contraband"; (iii) the threatened injury outweighs the TRO's damage; and (iv) the TRO is not adverse to the public interest, because it would protect other students' constitutional rights who attend prom and graduation.  Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1194-98.  The Court denied a request for injunctive relief in Salazar v. San Juan County Detention Center, No. CIV 15-0417 JB/LF, 2016 WL 335447 (D.N.M. Jan. 15, 2016)(Browning, J.), after concluding that, although the plaintiffs faced irreparable harm, the balance of equities favored them, and an injunction was not adverse to the public interest, the plaintiffs were unlikely to succeed on the merits.  See Salazar v. San Juan Cty. Detention Ctr., 2016 WL 335447, at *43-52.

## ANALYSIS

A TRO is an "extraordinary remedy," to which a movant must demonstrate a "clear and unequivocal right" to have its request granted.  Greater Yellowstone Coalition v. Flowers, 321 F.3d at 1256; See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181.  Here, the parties' cross-motions for TROs present the Court with essentially a binary choice: to grant the Plaintiffs' request

and enjoin 2301 Collins from acting to assume control over and ownership of Vida Encantada and its related entities, or to ratify 2301 Collins' asserted rights under the Transaction Documents to do so and compel the Plaintiffs to assist in this transfer.  While the Plaintiffs' and 2301 Collins' relief requires the Court to choose one side's over the other's, this contrast reveals a shared agreement between the parties that the Court must intervene to resolve the deadlock.  "Thus, the parties are generally in agreement that some form of preliminary relief is appropriate but in disagreement about who is entitled to it."  Washington Teachers' Union, Loc. No. 6 v. Am. Fed'n of Tchrs., 751 F. Supp. 2d 38, 50 (D.D.C. 2010)(Kollar–Kotelly, J).  Moreover, to deny both motions would set up a promised legal showdown on February 1, 2023, which would risk upsetting the relative position of the parties in a way that would compromise a trial on the merits.

Before a district court may issue a TRO pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make the same four showings as for a PI: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the PI "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits."  Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992).   See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004).   The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis.  Nken v. Holder, 556 U.S. at 434.

**I.**     **2301'S TRO HAS A HIGHER STANDARD TO MEET THAN THE PLAINTIFFS' TRO BECAUSE 2301 COLLINS SEEKS A MANDATORY TRO WHICH WOULD DISRUPT THE STATUS QUO, WHILE THE PLAINTIFFS SEEK A PROHIBITORY TRO TO PRESERVE THE STATUS QUO.**

From the outset, 2301's TRO faces the higher burden because its requested relief implicates all three types of preliminary relief that the Tenth Circuit specifically disfavors: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the enjoined party's part; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004), aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006)("O Centro II")).  Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009).  Determining the status quo means looking at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights."  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir. 1991), overruled on other grounds by O Centro II, 389 F.3d at 975.  When injunctive relief will change that status quo, "the movant has an 'even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued.'"  Salt Lake Tribune Publ'g Co. v. AT & T Corp., 320 F.3d 1081, 1099 (10th Cir. 2003)(quoting Kikumura v. Hurley, 242 F.3d at 955 (quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1098-99)).

2301 Collin's request that the Court enjoin the Plaintiffs to recognize and affirmatively assist in 2301 Collins' takeover of Vida Encantada and Diamond Care falls into all three categories

that the Tenth Circuit specifically disfavors, because injunctive relief would: (i) upset the status quo; (ii) compel mandatory action; and (iii) provide essentially all relief that 2301 Collins could obtain at trial.  Here, the status quo in "reality" is that the Plaintiffs presently own and operate Vida Encantada, and control Diamond Care, as distinct from the future legal determination of whether this "accords" with 2301 Collins' rights under the Transaction Documents.  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1100.  Accordingly, 2301 Collins' takeover of Vita Encantada and Diamond Care would upset the present state of affairs, particularly as benchmarked from when the Plaintiffs filed their TRO in State Court on December 22, 2022.  See Plaintiffs' TRO at 1.  The injunction also is disfavored by requiring the Plaintiffs' active assistance in their unwilling loss of their business.  Third, facilitating 2301 Collins' takeover of Vida Encantada and Diamond Care at this preliminary stage would grant nearly all the relief sought that 2301 Collins' Counterclaims seek, with the minor exception for whatever unspecified damages 2301 Collins might be able to claim based on the Plaintiffs' delays.  See Answer and Counterclaims ¶¶ 15-58, at 14-22. By contrast, the Plaintiffs' TRO does not implicate any of these disfavored categories. The Plaintiffs seek relief that (i) preserves the status quo -- their operation of Vida Encantada; (ii) restrains 2301 Collins from acting to take over Vida Encantada rather than compelling affirmative conduct, and (iii) will give the Plaintiffs only temporary control over the business until the issues are decided on the merits or the parties reach a satisfactory agreement.

## II. BECAUSE MARYLAND LAW DISFAVORS FORFEITURE FOR THE BREACHES THAT 2301 COLLINS ALLEGES THE PLAINTIFFS HAVE COMMITTED, THE PLAINTIFFS ARE MORE LIKELY THAN 2301 COLLINS TO SUCCEED ON THE MERITS.

Along with irreparable injury, the movant's likelihood of succeeding on the merits is "the most critical" factor in a court's TRO analysis.  Nken v. Holder, 556 U.S. at 434.  One way in

which the four Transaction Documents are interrelated is that an Event of Default under one of the documents will constitute an Event of Default under the other documents.  See Lease at 8; Pledge Agreement at 6; Guaranty at 5; Security Agreement at 8.  Here, 2301 Collins' breach-of-contract claims under the Pledge Agreement and the Guaranty are based on the argument that Diamond Care has defaulted under the Lease.  See Answer and Counterclaim ¶¶ 32-33, at 17 (regarding the Pledge Agreement); id. ¶ 41, at 18-19 (regarding the Guaranty); Plaintiffs' Response at 2-3.  Accordingly, the Court's analysis regarding which party is likely to prevail on the merits on the claim brought under the Transaction Documents first requires determining whether the Plaintiffs defaulted on their Lease, which, like the other Transaction Documents, chooses Maryland law to govern it.

When, as here, a court's jurisdiction rests on diversity of citizenship under 28 U.S.C. § 1332, the court must look to the forum state's choice-of-law rules to determine which state's substantive law to apply.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Pepsi-Cola Bottling Co. v. PepsiCo., Inc., 431 F.3d 1241, 1255 (10th Cir. 2005).  In New Mexico, choice-of-law analysis is a two-step process.  See Mosely v. Titus, 762 F. Supp. 2d 1298, 1314 (D.N.M. 2010)(Browning, J.)(citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 14, 140 N.M. 293, 296, 142 P.3d 374, 377).  "First, the Court must characterize the 'area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue.'"  Mosely v. Titus, 762 F. Supp. 2d at 1314 (quoting Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11, 140 N.M. at 296, 142 P.3d at 377).  The next step is to apply New Mexico's choice-of-law rule.  See Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 15, 140 N.M. at 296, 142 P.3d at 377).

When a claim sounds in contract, New Mexico generally will apply the choice-of-law rule of *lex loci contractus* -- the law of the place of contracting.  See Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 53, 144 N.M. 405, 421, 188 P.3d 1156, 1172.  Like most states, however, "New Mexico respects party autonomy; [therefore] the law to be applied to a particular dispute may be chosen by the parties through a contractual choice-of-law provision."  Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 144 N.M. 464, 467, 188 P.3d 1215, 1218 (citing N.M. Stat. Ann § 55-1-301(A)).  See United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 1989-NMSC-030, ¶¶ 11-12, 108 N.M. 467, 470, 775 P.2d 233, 236.  "[W]hen application of the law chosen by the parties offends New Mexico public policy," however, a New Mexico court "may decline to enforce the choice-of-law provision and apply New Mexico law instead."  Fiser v. Dell Computer Corp., 1989-NMSC-030, ¶¶ 11-12 144 N.M. at 467, 188 P.3d at 1218.  "New Mexico courts will not give effect to another state's laws where those laws would violate some fundamental principle of justice."  Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 144 N.M. at 467, 188 P.3d at 1218.  This analysis applies when the parties have negotiated a forum selection clause in their contract.  See MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc., 436 F.3d 1257, 1260 (10th Cir. 2006)("In cases like this one, where subject matter jurisdiction is based on diversity of citizenship, federal courts must look to the forum state's choice-of-law rules to determine the effect of a contractual choice-of-law clause.").

Here, for a breach-of-contract case that also involves a secured transaction, the Court will use New Mexico's choice of law rules.  On the record before the Court, which lacks any indication that applying Maryland law would offend New Mexico public policy, a New Mexico court would respect the contract's choice of Maryland law.  See Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 144 N.M. at 467, 188 P.3d at 1218 (citing N.M. Stat. Ann § 55-1-301(A)).  For 2301

Collins to prevail on the merits in its breach-of-contract action under Maryland law, [2] it must prove: (i) that the Plaintiffs' failure to (a) pay rent when due on the first of the month; and/or (b) provide required documentation; constitute breaches of the lease agreement; (ii) that, a Maryland court would permit these breaches to result in the Plaintiffs' forfeiture. [3] With the record before it, the Court predicts: (i) that it is more likely than not that the Plaintiffs breached the Lease, but (ii) it is unlikely that a court applying Maryland law would permit the forfeiture based on the Plaintiffs' breaches.

To justify terminating the Lease and related actions under the other Transaction Documents, 2301 Collins alleges that the Plaintiffs' conduct has caused several Events of Default. See 2301's TRO at 2; Plaintiffs' Response at 2. 2301 Collins groups the Plaintiffs' alleged breaches into two categories. See December 14 Letter at 1-2. The first involves Event of Default (a), a "failure by [the Plaintiffs] to pay the Rent when due and payable." December 14 Letter at 1. 2301 Collins asserts that Event of Default (a) does not have "any cure period." December 14 Letter at 1. The second basis for terminating the lease involves Event of Default (o), a "failure by [the Plaintiffs] to observe or perform any term, covenant or condition or the Lease, including, but not limited to the reporting requirements" of Lease §13 (dealing with the Plaintiffs' insurance coverage and requirements) and Lease §23.1 (dealing with financial statements). December 14

---

[2]Maryland courts use the same four-factor test before issuing injunctive relief, assessing a movants likelihood of success on the merits, the potential for irreparable harm, the balance of harm between the parties, and the public interest. See Fuller v. Republican Cent. Comm. of Carroll Cnty., 444 Md. 613, 635, 120 A.3d 751, 763 (2015).

[3]"The word forfeiture refers to the right of the lessor to terminate the lease because of a breach of covenant or some other wrongful act of the lessee." 49 Am. Jur. 2d Landlord and Tenant § 237. Here, the Plaintiffs forfeiture would entail both the loss of their leasehold interest in the Vida Encantada facility and their equity interest in Diamond Care.

Letter at 1-2.  2301 Collins asserts that these reporting requirements have a thirty-day cure period,

with which, as of January 17, 2023, the Plaintiffs have not complied, triggering Event of Default

(o).  See January 17 Letter at 2-3.  2301 Collins catalogues the Plaintiffs' alleged breaches of the

Lease in its TRO:

> [I]n addition to its default resulting from its incurable failure to timely pay
> November rent, Plaintiff Diamond Care has engaged in the following additional,
> uncured events of default under the Lease Agreement:
>
> - the failure to provide certificates of insurance for each line of
>   coverage as required by Section 13.1;
>
> - the failure under Section 13.1 to provide evidence it has paid the
>   premiums for each required line of insurance coverage;
>
> - the failure to provide complete copies of all insurance policies as
>   required by Section 13.1;
>
> - the failure under Section 13.1 to provide evidence that Defendant
>   and the holder of the mortgage on the facility are named as
>   additional insureds for each line of required coverage;
>
> - the failure to provide evidence that each insurer has agreed to give
>   Defendant and holder of the mortgage on the facility at least 60 days
>   written notice its policy is altered, allowed to expire, or canceled, as
>   required by Section 13.1;
>
> - the failure to provide evidence of a general public liability insurance
>   policy as required by Section 13.2.4;
>
> - the failure to provide evidence of malpractice insurance providing
>   coverage of up to $5 million as required by Section 13.2.5;
>
> - the failure to provide evidence of coverage for loss or damage
>   commonly covered by blanket crime insurance as required by
>   Section 13.2.9;
>
> - the failure to provide annual financial statements as detailed and
>   required by Section 23.1(a)(i);
>
> - the failure to provide separate annual financial statements for the
>   facility as required by Section 23.1(a)(ii);
>
> - the failure to provide the variance report required by Section
>   23.1(a)(iii);
>
> - the failure to provide the Officer's Certificate required by Section

23.1(a)(iv);

- the failure to provide the certificate from a certified public accountant required by Section 23.1(a)(v);

- the failure to provide copies of each cost report filed with a governmental agency for the facility as required by Section 23.1(c);

- the failure to provide copies of Medicare and Medicaid rate letters and correspondence as required by Section 23.1(d);

- the failure to provide copies of surveys performed by the appropriate governmental agencies for licensing or certification as required by Section 23.1(f);

- the failure to provide a capital and operating budget for the facility and a financial and marketing plan as required by Section 23.1(h); and

- the failure to provide satisfactory evidence that each license and permit required for operation of the facility has been unconditionally renewed as required by Section 23.1(l).

2301's TRO at 5-7.  See December 14 Letter at 2; January 17 Letter at 3-4.  For this MOO's purposes, the Court accepts the 2301 Collins' factual allegations as true, i.e. that the Plaintiffs did not pay their November, 2022, rent before November 16, 2022, and that they have not provided documentation required under Lease §§13 and 23.[4]  To determine whether these facts would make 2301 Collins substantially likely to win its breach-of-contract action on the merits, the Court must assess these facts under the Transaction Documents and Maryland law.

The first issue is whether the Plaintiffs' actions were Events of Default under the Lease's terms.  See Lease §2.1, at 2-19.  Regarding the November, 2022, late-rent payment, 2301 Collins argues that Event of Default (a), in contrast to other Events of Default listed in Lease §2.1, does

---

[4]As distinct from the Plaintiffs' breach of the Lease's reporting requirements, the record does not contain sufficient evidence to determine whether the Plaintiffs have failed to obtain the insurance coverage Lease §13 requires or to keep the records required under Lease §23.  For this MOO's purposes, the Court assumes that the Plaintiffs possess the required coverage and documentation, and addresses only whether the Plaintiffs' failure to provide this documentation breaches the Lease.

not provide any cure period.  See 2301's TRO at 10.  At the January 23, 2023, hearing, 2301 Collins' counsel conceded that while this provision is harsh the highly-regulated and high-stakes business of operating nursing homes necessitates this harshness, because a landlord must be able to step quickly into its tenant's shoes if needed.  The Plaintiffs respond by pointing to Lease §3.1.1, which sets a five-percent surcharge on late rent, with interest accruing on this amount after thirty days, as well as a provision to recover costs associated with the delay.  See Plaintiff's Response at 4.  Accordingly, the Plaintiffs argue, "it appears that at the time the Lease was executed the parties expected that rent payments might occasionally be late and intended, in such a case, that Vida Encantada would have, at a minimum, a 30 day grace period in which to cure through the payment of a late charge."  Plaintiffs' Response at 4.  The Plaintiffs bolster their argument by discussing the Guaranty, which gives Diamond Care Health Network, LLC the "right to cure the late rent payment upon receiving demand for payment."  Plaintiffs Response at 4 (citing Guaranty §§2, 9, 10).  Given the record before it at this stage in the proceedings, the Court predicts that the Plaintiffs delinquent November, 2022, rent payment triggers Event of Default (a).  The Court places the most weight on the absence of a cure period in Event of Default (a), which contrasts with the detailed cure periods provided for other events.  See Lease §2.1, at 6-9.  Lease §3.1.1's late rent provision can be read not as granting Diamond Care a right to cure in the face of 2301 Collins' refusal to accept payment, but as establishing a formula to compensate 2301 Collins when it is willing to accept late rent.  For example, 2301 Collins could have applied the late rent surcharge during the numerous prior months where the Plaintiffs were late paying their rent.  The Plaintiffs' argument regarding the Guaranty is more persuasive, but the Plaintiffs have not established why the Court should read the Guaranty as bestowing a right and not just a duty to cover the Plaintiffs' obligations under the Lease.

Regarding Event of Default (o), 2301 Collins points to a lengthy list of documentation which it demanded from the Plaintiffs in its December 1 and December 14 Letters which the Plaintiffs failed to provide within the thirty-day cure period.  See 2301's TRO at 10.  The Plaintiffs rejoin that 2301 Collins "did not ever request such documents until mid-December 2022, when it seized upon the documents as a way to bolster its pretext for terminating the Lease due to the late rent payment."  Plaintiffs' Response at 6.  This timing, the Plaintiffs argue, shows that their failure to provide these documents does not rise to the level of a "material breach of the Lease."  Plaintiffs' Response at 6.  The Plaintiffs do not, however, provide any justification why they have not provided the required documents when they have been on notice since receiving the December 1 Letter that 2301 Collins would use the reporting requirements of Lease §§13 and 23 as a basis – pretextual or not – to terminate the lease.  Accordingly, the Court concludes that the Plaintiffs failure to cure these reporting deficiencies within thirty days triggers Event of Default (o).

The next step in determining the parties' relative chances of succeeding on the merits involves whether, under Maryland law, these Events of Default are substantial or material breaches of the lease.  However, it would be premature for the Court to make this determination given the briefing before it.  2301's TRO does not cite to Maryland law.  See 2301's TRO at 8-13.  While the Plaintiffs discuss Maryland law, the Plaintiffs base their argument regarding the materiality of a breach on caselaw dealing with contract recission.  See Plaintiffs' Response at 6 (citing Maslow v. Vanguri, 168 Md. App. At 324, 896 A.2d at 423 (Md. App. 2006)).  Caselaw dealing with rescinding a contract is inapposite because 2301 Collins is not seeking to rescind the Lease but to exercise its contractual rights under the Transaction Documents, which specifically contemplate early termination and takeover.  See 2301's TRO at 13.  The Court, however, need not determine at this point whether these events of default constitute material breaches because, in any case, a

Maryland court would intervene to prevent the Plaintiffs' forfeiture.

Courts have long recognized their equitable power to intervene in landlord-tenant disputes to prevent unjust forfeiture.

> The power of equity to relieve against a forfeiture of a lease for nonpayment of rent was asserted at an early time and has been developed and extended so that it is now exercised by all courts capable of giving equitable relief or administering the rules of equity. The source, nature, and extent of the power has been variously described, but its existence is now undoubted, and its exercise is limited only by statute or through the operation of some independent rule of law.

H.D. Warren, Annotation, Relief Against Forfeiture of Lease for Nonpayment of Rent, 31 A.L.R.2d 321. See also A.S.M, Annotation, Power of Equity to Relieve Against Forfeiture of Lease for Nonpayment of Rent 16 A.L.R. 437. Maryland's highest court[5] has long recognized this doctrine, stating that "equitable relief against forfeiture will be afforded where a default in the payment of rent is due to fraud, mistake, surprise or accident." Dreisonstok v. Dworman Bldg. Corp., 264 Md. 50, 59, 284 A.2d 400, 404 (1971). The Supreme Court of Maryland will interpret a lease where nonpayment of rent causes forfeiture "as being, in effect, a mere security for the payment of the obligation. Thus, equitable relief is ordinarily granted upon the payment of the principal sum with interest and costs," as this payment is adequate compensation to the landlord for the delay. Dreisonstok v. Dworman Bldg. Corp., 264 Md. At 58-59, 284 A.2d at 404 (citing Lombardo v. Clifford Bros. Co., 139 Md. 32, 36, 114 A. 849 (1921); Wylie v. Kirby, 115 Md. 282, 286, 80 A. 962 (1911); and Carpenter v. Wilson, 100 Md. 13, 22, 59 A. 186 (1904)). Maryland law will not protect tenants from forfeiture, however, if the tenant's failure to comply with the

---

[5]Maryland's highest court was formerly known as the Court of Appeals, but in 2022 was renamed to the Supreme Court of Maryland. See Hannah Gaskill, "Reigning Supreme: Maryland's Highest Court Gets a New Name, With New Titles for Judges," The Baltimore Sun, December 15, 2022. This MOO will use the current name, the Supreme Court of Maryland.

lease by paying rent on time "was calculated, deliberate, wilful [sic], persistent, [or] violated the fundamental principles of fair dealing." Dreisonstok v. Dworman Bldg. Corp., 264 Md. at  60-61 284 A.2d at 405.  In addition, "the familiar principle that equity, although willing to grant relief from a forfeiture as a result of failure to pay rent, will ordinarily refuse to prevent a forfeiture arising from breaches of covenants such as . . . [a tenant's failure] to insure against fire . . . ." Baltimore Butchers Abattoir & Live Stock Co. v. Union Rendering Co., 179 Md. 117, 122, 17 A.2d 130, 133 (1941).

A century ago, the court in Lombardo v. Clifford Bros. Co. ("Lombardo") addressed circumstances similar to those in this case.  Lombardo leased property in Baltimore to Clifford Bros., a candy manufacturer, with an option for Clifford Bros. to purchase the property for a lump sum.  See 139 Md. at 32, 114 A. at 849.  The lease provided that rent became due at the beginning of each month and was payable within ten days.  See 139 Md. at 32, 114 A. at 849.  Over the course of two years, Clifford Bros. was late paying its rent numerous times, approximately one out of every four.  See 139 Md. at 32, 114 A. at 849-50.  When Clifford Bros. sought to purchase the property, Lombardo refused to sell, alleging that Clifford Bros. had "repeatedly defaulted" on the lease by its late rent payments.  139 Md. at 32, 114 A. at 849.  The court determined that Lombardo's repeated acceptance of Clifford Bros.' late rent payments during "her long course of dealing with the plaintiff was . . . sufficient to have led the plaintiff to believe that prompt payment would not be insisted upon, and that it was not her intention to enforce a forfeiture because of the alleged breach of said condition of the lease." 139 Md. at 32, 114 A. at 849-50.  Because Lombardo had not given Clifford Bros. notice of her intention to reclaim the property for late payment and Clifford Bros. had rent payments "ready for delivery to [Lombardo] upon her willingness to accept" them, the court ruled against Lombardo and ordered her to convey the property to Clifford

Bros., pursuant to Clifford Bros.' exercise of their option under the lease to purchase the property. 139 Md. at 32, 114 A. at 849-50.

Similarly, Diamond Care is a commercial tenant who, over the course of several years, frequently paid its rent several days late.  On every occasion before November, 2022, 2301 Collins accepted the Plaintiffs' late rent payments and never gave any indication that it would move to terminate the lease due to a late rent payment.  There is no indication in the record that the Plaintiffs a late payment "was calculated, deliberate, wilful [sic], persistent, [or] violated the fundamental principles of fair dealing."  Dreisonstok v. Dworman Bldg. Corp., 264 Md. at  60-61 284 A.2d at 405.  Nor has 2301 Collins shown that the Plaintiffs breached their covenants to obtain the insurance Lease §13 requires, on that they did not provide documentation.  Baltimore Butchers Abattoir & Live Stock Co. v. Union Rendering Co., 179 Md. 117, 122, 17 A.2d 130, 133 (1941). requisite or that the did not properly insure their business.  Accordingly, the Court predicts that the Plaintiffs' equitable arguments against forfeiture are substantially likely to succeed on the merits.

### III. THE PLAINTIFFS ARE MORE LIKELY THAN 2301 COLLINS TO BE IRREPARABLY HARMED IF THE COURT DOES NOT GRANT A TRO.

To succeed in its request for a TRO, a party must demonstrate that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury," and "a remedy in equity is warranted" in light of "the balance of hardships between the plaintiff and defendant." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  See N. N.M. Stockman's Ass'n v. United States Fish & Wildlife Serv., 494 F. Supp. 3d 850, 1030 (D.N.M. 2020)(Browning, J.).  As with TROs, "[i]t is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal."  Diné Citizens Against Ruining Our Env't v. Jewell, No. CIV 15-0209 JB/SCY, 2015 U.S. Dist. LEXIS 109986,

at *56 (D.N.M. Aug. 14, 2015)(Browning, J.)(citing Kikumura v. Hurley, 242 F.3d at 955), aff'd

839 F.3d 1276 (10th Cir. 2016).  "[I]rreparable injury" is "harm that cannot be undone, such as by

an award of compensatory damages or otherwise."  Salt Lake Tribune Pub. Co., LLC v. AT & T

Corp., 320 F.3d 1081, 1105 (10th Cir. 2003)(citing Tri-State Generation & Transmission Ass'n v.

Shoshone River Power, Inc., 805 F.2d at 355).

> As for irreparable harm: Normally the mere payment of money is not considered
> irreparable, see Sampson v. Murray, 415 U.S. 61, 90 (1974), but that is because
> money can usually be recovered from the person to whom it is paid. If expenditures
> cannot be recouped, the resulting loss may be irreparable.

Philip Morris USA Inc. v. Scott, 561 U.S. 1301, 1304 (2010)(Scalia, J.).

Having assessed the arguments and facts that both parties offer in support of their TROs,

see Plaintiffs' TRO at 9; 2301's TRO at 13, the Court concludes that the scales tip decidedly in

the Plaintiffs' favor.  The Plaintiffs identify the significant nonmonetary interest that would be

harmed irreparably without a TRO: losing their control and ownership of Vida Encantada and

Diamond Care, which they have been operating for twelve years and assert rights under the Lease

to operate for at least ten more.  See Plaintiffs' TRO at 9.  As compared to restraining temporarily

2301 Collins from taking control of Vida Encantada, unwinding such a transition would be more

difficult for the parties, the Court, and the residents of Vida Encantada to navigate.  By contrast,

the readily apparent harms that 2301 Collins would face by the Court restraining its takeover of

Vida Encantada -- covering the mortgage payments, paying attorneys fees to litigate this action,

and any lost profits from the delay -- are temporary injuries, readily ameliorated with money

damages.  See Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d at 1105.  The Lease

itself envisions these damages as monetary, with provisions addressing added charges for late rent,

reimbursement for costs associated with paying the mortgage, awards of attorneys' fees, and how

interest accrues on past-due amounts.  See Lease §§16.1-16.4, at 45-47.  The nonmonetary and purportedly irreparable harm that 2301 Collins alleges is the risk that Vide Encantada will lose its license to operate as a nursing home.  See 2301's TRO at 13-14. [6]  2301 Collins links this danger to Plaintiffs' default on the lease.  See 2301's TRO at 13-14.  On the limited record available, which does not include any facts about this license or any briefing about the laws governing nursing homes in New Mexico, 2301's Collins argument does not persuade the Court.  It is unclear to the Court whether 2301 Collins's reasoning is (i) that the Plaintiffs put the license at risk by the fact of their default; or (ii) that defaulting on the lease evinces an untrustworthiness or unfitness to run Vida Encantada.  Regarding the former, 2301 Collins does not explain how a delayed rent payment and failure to provide documentation to a private landlord would lead to a government agency or agencies to revoke a license.  Regarding the latter, where the Plaintiffs have established a twelve-year track record of operating this highly-regulated facility and attempted to prepay future months of rent, the delinquent payments and incomplete documentation alleged by 2301 Collins as Events of Default are not probative of Plaintiffs' fitness to continue operating Vida Encantada.

## IV.    **THE BALANCE OF EQUITIES FAVORS THE PLAINTIFFS.**

The third factor for a Court to consider before issuing preliminary relief is whether the balance of equities favors the movant.  See Winter, 555 U.S. at 19-20.  Also referred to as the balance of hardships, this factor requires a movant to show that the threatened injury averted by the injunction "outweighs any injury to [other parties] caused by granting the injunction."  Awad

---

[6]At the hearing, 2301 Collins's counsel stated the license at issue is held by 2301 Collins or a related entity as the facility's owner, rather than any of the Plaintiff as owners of Vida Encantada's business and operators of its services.  The Court's search of public records, however, has only found records listing "DIAMOND CARE VIDA ENCANTADA, LLC" as the licensee for Medicare Number 3205065.  See https://providersearch.health.state.nm.us/ (searching for "Vida Encantada") .

v. Ziriax, 670 F.3d 1111, 1131 (10th Cir. 2012).  As the Court has discussed in its analysis of the
likelihood of success and irreparable injury factors, the injury that the Plaintiffs would suffer is the
forfeiture of their leasehold and their business.  This injury outweighs any injury 2301 Collins
would suffer from being compelled temporarily to continue leasing the premises to the Plaintiffs.
Accordingly, the Court concludes that this factor weighs in favor of granting the Plaintiffs' TRO.

## V.  A TRO PREVENTING 2301 COLLINS FROM ASSUMING CONTROL OVER VIDA ENCANTADA LIKELY WOULD NOT BE ADVERSE TO THE PUBLIC <u>INTEREST</u>.

Turning to the fourth factor, the Court concludes that issuing a TRO enjoining 2301
Collins' present attempts to take ownership of Vida Encantada would not be adverse to the public
interest.  The principal impact on the public concerns the seventy residents of Vida Encantada,
who are by definition some of society's most vulnerable members.  The Plaintiffs argue that the
residents' interests are best served by continuity of operations and avoiding any disruptions that
might compromise their care.  See Plaintiffs' TRO at 9-10.  2301 Collins agrees that the residents'
wellbeing is important, but counters that a "prompt and smooth transition" better serves the
residents' and therefore the publics' rather than allowing lingering uncertainty.  2301 Collins' TRO
at 14.  The record, while thin, is sufficient to convince the Court to maintain the status quo of the
Plaintiffs running Vida Encantada until the PI hearing.  While 2301 Collins has experience
operating nursing homes, the Plaintiffs have experience operating this nursing home.  The
Plaintiffs argue that "any change in management of the nursing home will not be seamless," and
the Court agrees that this presents a greater risk to the patients than maintaining the status quo.
Plaintiffs' Response at 9.  2301 Collins also argues that the public interest is served by "the
enforcement of valid, conscionable contractual provisions."  2301's TRO at 14 (citing <u>Fiser v.</u>

Dell, 2008-NMSC-046, ¶ 24, 144 N.M. 464, 187 P.3d at 1222.).  The Plaintiffs respond that the public's interest is served equally by allowing contracting parties "access to judicial remedies," noting that the Supreme Court of the State of New Mexico in Fiser v. Dell refused to apply an arbitration clause that would have prevented purchasers from using class actions as a remedy to vindicate their rights.  Plaintiffs' Response at 10.  The Court is more persuaded by the Plaintiffs' arguments, and the Court finds it unlikely that granting the Plaintiffs' TRO would harm the public interest.

## VI.   THE PLAINTIFFS MUST SECURE A BOND COMPARABLE TO FOUR MONTHS' RENT PLUS LATE FEES: $160,000.

Under rule 65(c), the Court may grant a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The Court must consider whether a bond is necessary.  See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable").  See also Flood v. ClearOne Comm'ns, 618 F.3d 1110, 1126 n.4 (10th Cir. 2010).  Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security'" and may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1215 (10th Cir. 2009)(quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).  Neither party has addressed the subject of a bond, so the Court must determine on its own a suitable bond.  See Requirement of Security for the Issuance of a Preliminary Injunction or Temporary Restraining Order, 11A Fed. Prac. & Proc. Civ. § 2954 n. 48 (3d ed.)("The district court cannot simply set an injunction bond at whatever high number it thinks appropriate; instead, reasons must

support the number chosen so that the reviewing court can determine whether the number was within a range of options from which one could expect a reasonable trial judge to select.")(citing Starsurgical, Inc. v. Aperta, LLC, 832 F. Supp. 2d 1000, 1006 (E.D. Wis. 2011)(Adelman, J.)).

Here, the Court's decision to grant the Plaintiffs' TRO is premised on the Plaintiffs being willing and able to pay their rent and on the belief that any injury 2301 Collins might suffer is redressable with money damages.  In these circumstances, it is appropriate to require the Plaintiffs to post a bond comparable to the outstanding rent.  In fairness to 2301 Collins, the Court will increase the bond's amount by applying the Lease's five-percent late-rent surcharge to all four months' rent.  See Lease §3.1.1, at 20-21.  When Diamond Care attempted to pay its November, 2022, rent plus a five-precent late fee, it calculated the amount to be slightly less than $40,000.00.  See Amended Complaint ¶ 39, at 6.  Accordingly, the Court sets the Plaintiffs' bond at $160,000.00, reflecting the rent and late charges accruing over four months -- November, 2022, through February, 2023.

**IT IS ORDERED** that: (i) Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction, filed in State Court on December 22, 2022, filed in Federal Court on January 20, 2023 (Doc. 6) is granted; (ii) the Defendant's Application for Temporary Restraining Order, filed January 22, 2023 (Doc. 14) is denied; (iii) Defendant 2301 Collins NM LLC, shall not: (a) act to evict the Plaintiffs from Vida Encantada Nursing & Rehab; (b) absent the Plaintiffs' consent, act to repossess, foreclose on, sell, or acquire the equity interests in Diamond Care Vida Encantada, LLC or other property the Plaintiffs pledged, or (c) otherwise interfere with Plaintiffs' operation of Vida Encantada Nursing & Rehab or Diamond Care Vida Encantada, LLC; (iv) the Plaintiffs' chosen representatives are to continue serving as the officers of Diamond Care Vida Encantada, LLC; (v) the Plaintiffs shall post a bond with the Court in the amount of $160,000.00;

(vi) the Temporary Restraining Order expires in 14 days; and (vi) the Court sets a hearing for the parties' requests for preliminary injunctions for February 15, 2023, at 1:30 p.m.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

George D. Giddens, Jr.
Giddens & Gatton Law, P.C.
Albuquerque, New Mexico

-- and --

James O. Bell
Spiess & Bell, P.C.
Phoenix, Arizona

    *Attorneys for the Plaintiffs*

Scott Fuqua
Fuqua Law & Policy, P.C.
Santa Fe, New Mexico

    *Attorney for the Defendant*